# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

LAUREN J. ROSS

       **Plaintiff,**

                                        **Case No. 2:09-cv-905**

  **v.**                                  **JUDGE GREGORY L. FROST**

                                        **Magistrate Judge Mark R. Abel**

AMERICAN RED CROSS, et al.,

       **Defendants.**

## OPINION AND ORDER

This matter is before the Court on the following filings by the parties:

1.    Defendant American Red Cross's Motion to Exclude and Preclude the Use of the Testimony of Mr. David Woodruff and for Summary Judgment (ECF No. 120), Plaintiff's Memorandum in Opposition (ECF No. 148), and Defendant's Reply in Support (ECF No. 159);

2.    The Motion of Plaintiff Lauren J. Ross to Strike Affidavit of Red Cross Standard of Care Expert Linda Chalmers (ECF No. 168), Defendant's Response in Opposition (ECF No. 172), and Plaintiff's Reply in Support (ECF No. 174);

3.    Plaintiff's Response to the Defendant's objections to various evidentiary materials attached to and/or referenced in Plaintiff's Memorandum in Opposition to summary judgment (ECF No. 164); and

4.    Plaintiff's motion to substitute certified copies of letters issued to the American Red Cross from the United States Department Health and Human Services, Food and Drug Administration, for uncertified copies attached to Plaintiff's Memorandum in Opposition to summary judgment (ECF No. 166).

For the reasons more fully explained below, Defendant's motion to exclude Woodruff's

testimony and for summary judgment (ECF No. 120) is **DENIED,** Plaintiff's motion to strike Chalmers' affidavit (ECF No. 168) is **DENIED**, and Plaintiff's motion to substitute certified copies (ECF No. 166) is **DENIED AS MOOT.**

## I. Background

This case originated in the Franklin County (Ohio) Court of Common Pleas, where Plaintiff Lauren J. Ross filed a Complaint alleging negligence against the American Red Cross (the "Red Cross"). (Compl., ECF No. 2-1.) Ross alleges that she suffered physical injury due to the negligence of the Red Cross employee who drew her blood during a blood donation. (*Id.*, ¶ 3.) Red Cross removed the case to this Court, invoking federal jurisdiction under 36 U.S.C. § 300105 and *American Natl. Red Cross v. S.G. & A.E.*, 505 U.S. 247, 248, 112 S. Ct. 2465, 120 L. Ed. 2d 201 (1992). (Notice of Removal, ECF No. 2.)

On September 12, 2008, Plaintiff came to the Central Ohio office of the American Red Cross to give a blood donation. Plaintiff was an experienced donor, having donated blood numerous times previously. Red Cross employee Dedra Montague was the phlebotomist who was assigned to draw a unit of blood from Plaintiff. At that time, Montague had nearly six years of donor blood collection experience with the Red Cross.

Montague first attempted to draw blood from Plaintiff's left arm. Almost immediately upon Montague sticking the needle into Plaintiff's arm, Plaintiff felt pain and demanded that Montague remove it. Montague estimates that the needle was less than a half-inch into Plaintiff's arm at the time Plaintiff asked her to remove it. (Montague Dep. 16, ECF No. 119-1.) There was no bleeding when Montague withdrew the needle, indicating that the needle did not hit a vein. (*Id.*; Chalmers Aff. Ex. 1, at 4, ECF No. 151-1.) According to Plaintiff, her arm "felt

as if it was burning, it hurt and [the pain] seemed to paralyze movement of my arm.  (Pl.'s

Interrog. Resps. 7, ECF No. 148-6.)  The pain persisted even after Montague removed the

needle.  In the numerous times Plaintiff previously donated blood, she had never felt that kind of

pain.  Plaintiff described the pain as "excessive" and told Montague that she "thought she

[Montague] had hit a nerve."  (*Id.*)  A Red Cross manager gave Plaintiff an ice pack to place on

her left arm to alleviate the pain.

Despite the pain in her left arm, Plaintiff continued with the blood donation, allowing

another Red Cross employee to draw a unit of blood from her right arm.  Plaintiff continued to

complain to the Red Cross about the pain in her left arm.  Plaintiff felt a "burning, throbbing

sensation all the way up close to the shoulder."  (*Id.*)  Plaintiff left the Red Cross facility and

went home because of the pain.  The Red Cross gave Plaintiff a "green sheet" that gave

instructions to follow with regard to any complications arising from the injection.  On a form

titled "Donor Reaction / Injury Record (DRIR)," the Red Cross coded the "complication"

involving Plaintiff as "XN," meaning that the patient suffered a "nerve irritation."  (Montague

Dep. 19 and Ex. 2.)

Over the six-day period following the incident, Red Cross employee Linda Stacy had

telephone contact with Plaintiff as a follow-up.  Red Cross records indicate that Plaintiff reported

that she continued to experience pain in her biceps and shoulder, was suffering neck pain, was

feeling a loss of strength in her left arm, and was having trouble sleeping since the day of the

blood donation.  (Montague Dep. Ex. 1.)  Records indicate that Stacy gave Plaintiff verbal

instructions relating to "XN" (*i.e.*, nerve irritation).

In the weeks following the incident at the Red Cross, Plaintiff sought medical care from

various medical providers, as she continued to suffer pain. Over the next several months, eight physicians who treated Plaintiff either diagnosed or opined that Plaintiff suffered from complex regional pain syndrome ("CRPS"), a condition also known as reflex sympathetic dystrophy ("RSD"). Plaintiff alleges that she has been unable to continue her employment as owner of a personal training business because of her injury and that the injury is so debilitating as to permanently affect her ability to work in the future. (Compl., ¶ 5.) Plaintiff's retained expert in this case, board certified neurologist Robert L. Knobler, M.D., Ph.D., agrees that Plaintiff suffers from CRPS/RSD and has opined that the "needle stick" by Montague caused the onset of that condition in Plaintiff.

## II. Discussion

The Red Cross moves for summary judgment on Plaintiff's Complaint under Fed. R. Civ. P. 56. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id.* (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)); *Hamad v. Woodcrest Condo. Ass'n*,

328 F.3d 224, 234 (6th Cir. 2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52).

### A.  The Red Cross's Motion to Exclude Woodruff's Expert Testimony

As a threshold issue to resolve before reaching the merits of the Red Cross's motion for summary judgment, the Red Cross argues that the Court should exclude the testimony of David Woodruff. Plaintiff disclosed Woodruff as a testifying expert and relies on his opinion to establish that the Red Cross deviated from the applicable standard of care during the blood donation process that allegedly caused Plaintiff's injury.

The Federal Rules of Evidence provide that expert witnesses may only testify where that testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. Expert witnesses must be qualified to testify to a matter relevant to the case, and a proffering party can qualify their expert with reference to his "knowledge, skill, experience, training or education." *Id.  See also Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 293 (6th Cir. 2007). In this case, the Red Cross challenges both Woodruff's qualifications as an expert and his ability to testify under the relevance and reliability standards set forth in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L. Ed. 2d 469 (1993), and its progeny.

## 1. Woodruff's Qualifications

In order to assist in her proof that the Red Cross was negligent, Plaintiff seeks to have Woodruff testify as to the standard of care applicable to nurses. (Woodruff Dep. 10, ECF No. 122-1.) In Woodruff's opinion, "nerve injuries" are "completely preventable" in a properly performed phlebotomy. (*Id.* at 70.) Consistent with that view, Woodruff opines that Montague *must* have breached the applicable standard of care because a nerve injury *necessarily* means that Montague performed the venipuncture "incorrectly." (*Id.* at 103, 118.)[1]

The Red Cross challenges Woodruff's qualifications to give expert testimony in this case. Woodruff holds bachelor's and master's degrees in nursing from Kent State University and has been a nursing instructor at various institutions (including Kent State and the University of Akron) since 1992. Woodruff also worked as a clinical nurse for 13 years. In these clinical and educational settings, Woodruff has had experience performing and teaching venipuncture. Despite these qualifications in the field of nursing, the Red Cross argues that Woodruff is not qualified to give expert testimony under Fed. R. Civ. P. 702 because of his undisputed lack of experience in blood donor phlebotomy. While Woodruff has experience performing a venipuncture for the purpose of drawing small amounts of blood from patients, Woodruff admits that he has never performed a donor phlebotomy to draw an entire "unit" of blood from a patient. (*See* Woodruff Dep. 43.) Because of the lack of experience in the relevant field of "donor phlebotomy," the Red Cross contends he is unqualified to render an opinion as to the appropriate

---

[1]"Venipuncture" is the process of inserting a needle into a vein; "phlebotomy" is the process of obtaining blood from donors. (Wissel Aff. ¶ 6, ECF No. 120-2; Woodruff Dep. 24.) Thus, a phlebotomy necessarily involves a venipuncture, but a venipuncture can be performed without a phlebotomy.

standard of care.

Though Woodruff is trained as a nurse and has venipuncture experience using needles similar in size to those used in donor phlebotomy, the Red Cross argues that this training does not qualify him to opine on whether Montague breached the appropriate standard of care.[2] The Red Cross points to Woodruff's lack of specific training in donor phlebotomy and his lack of knowledge of the donor phlebotomy standards set forth by the American Association of Blood Banks ("AABB"). The Red Cross also takes issue with Woodruff's lack of familiarity with the Red Cross's own policies and standard operating procedures. Without specific knowledge and experience related to donor phlebotomy, the Red Cross contends that Woodruff's testimony is not "expert" testimony and is therefore of no use under Fed. R .Evid. 702.

Though the Red Cross makes much of the fact that Woodruff lacks working knowledge and experience in the specific field of "donor phlebotomy" (that is, the drawing of a unit of blood in a blood donation context), the Court finds the Red Cross's focus to be unduly narrow. A witness with general qualifications in a field can be properly qualified as an expert; the lack of experience in a more specialized area within the field goes to the weight and not admissibility of the expert's testimony. *See Surles* at 294. The fact that a witness with expertise and/or experience specific to donor phlebotomy might be able to formulate opinions based on that knowledge does not *ipso facto* mean that a nursing expert cannot also offer testimony that is helpful to a trier of fact. *See First Tenn. Bank Nat'l Ass'n v. Barreto,* 268 F.3d 319, 333 (6th

---

[2]At his deposition, Woodruff testified that a "19-gauge needle" is typically used when drawing a unit of blood at a blood bank (Woodruff Dep. 33), a fact that the Red Cross has not disputed in its summary-judgment papers. Woodruff testified to having experience using needles larger than that in non-phlebotomy contexts, such as injecting IV fluids. (*Id.* at 34.)

Cir.2001) (describing the plaintiff's description of the "central issue" for trial as "unduly narrow"; the expert's unfamiliarity with some aspects of the subject at hand informed weight and not admissibility of his testimony); *Smith v. BMW N. Am., Inc.,* 308 F.3d 913, 919 (8th Cir.2002) (finding that district court abused its discretion by excluding testimony of an expert witness at the summary judgment stage simply because the witness lacked more specialized expertise). The Red Cross's objections to the specifics of Woodruff's experience and whether they qualify him to opine authoritatively in the area of blood donor phlebotomy are matters that inform the *weight* of Woodruff's testimony, not its admissibility.

Plaintiff's theory of liability in this case also informs the issue of Woodruff's qualification to testify under Fed. R. Civ. P. 702. Plaintiff contends, among other things, that the Red Cross phlebotomist was negligent in her placement of the needle in Plaintiff's arm, leading to the vein being missed and a nerve being struck in the process. Under this theory, the distinction between donor phlebotomy and other types of venipuncture is not necessarily relevant to the matter at hand; the central issue is whether the phlebotomist fell below the standard of care when she placed the needle in Plaintiff's arm on the day in question. Thus, the Red Cross's emphasis on Woodruff's lack of expertise in the specific field of donor phlebotomy takes an "unduly narrow approach to defining the central issue at trial." *Barreto* at 333. Because Woodruff has established that he is knowledgeable in venipuncture generally and, in particular, professed experience and training in large needle venipuncture, his total knowledge and experience is enough to qualify him as an expert in this case. It is ultimately for the jury to decide how to weigh Woodruff's lack of experience specific to donor phlebotomy.

## 2.    *Relevance and Reliability*

The fact that a witness may have the "knowledge, skill, experience, training, or education" necessary to qualify as an expert is only the first hurdle to clear under Fed. R. Evid. 702. The expert's proposed testimony must also (1) "be 'relevant to the task at hand'" and (2) "rest 'on a reliable foundation.'" *Surles*, 474 F.3d at 294 (quoting *Daubert*).

In *Daubert*, the Supreme Court established the relevance and reliability requirements in the context of scientific evidence proffered by a would-be expert. The Supreme Court later confirmed that *Daubert* principles apply generally to all expert testimony admissible under Fed. R. Evid. 702. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 148, 119 S. Ct. 1167, 143 L. Ed.2d 238 (1999). The teachings of *Daubert* and *Kumho* are now included in Fed. R. Evid. 702 itself, which allows opinion testimony from an expert when (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact, (2) the testimony is based upon sufficient facts or data, (3) the testimony is the product of reliable principles and methods, and (4) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702. The trial court plays the role of "gatekeeper" in deciding whether the expert's proffered testimony meets these criteria. In discharging that role, district courts possess broad discretion to make admissibility determinations. *Pride v. BIC Corp.,* 218 F.3d 566, 578 (6th Cir.2000).

*Daubert* itself set forth a list of non-exhaustive factors to guide district courts in assessing reliability. *Daubert,* 509 U.S. at 593-94. These factors are: (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and

maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community. *Id.* District courts, however, need not adhere rigidly to these non-exhaustive factors: the gatekeeper inquiry "is a flexible one," *id.* at 594, and a district court has "the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire,* 526 U.S. at 142. In some contexts, the *Daubert* factors may be less pertinent to the inquiry than a witness's personal knowledge and experience. *See Barreto,* 268 F.3d at 335 (citing *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. 1167); *see also Ellis v. Gallatin Steel Co.,* 390 F.3d 461, 470 (6th Cir.2004). The gatekeeping inquiry is context-specific and "must be tied to the facts of a particular case." *Kumho Tire,* 526 U.S. at 150.

The gatekeeper role, however, is not intended to supplant the adversary system or the role of the jury; rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. The Court's role is simply to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value. *Wellman v. Norfolk and W. Ry. Co.*, 98 F. Supp. 2d 919, 923-24 (S.D. Ohio 2000).

The Red Cross argues that Woodruff's testimony is unreliable because his opinion is based on "two linked suppositions" rather than knowledge of the relevant standard of care. (Def.'s Mot. Summ. J. 14, ECF No. 120.) The Red Cross complains that Woodruff relies on the flawed premise that nerves do not "overlie" veins in the antecubital fossa (*i.e.*, the region of the arm where blood is typically drawn) because nerves are "deeper structures" than veins, leading

to the flawed conclusion that "a nerve strike cannot occur during the course of a properly performed phlebotomy." (*Id.* (citing Woodruff Dep. 66-67, 70, 73, 118).) The Red Cross also takes issue with the fact that Woodruff does not rely on any publications (except *Gray's Anatomy*) or opinions of medical professionals to support his view that nerve injury was preventable in a properly conducted phlebotomy or venipuncture; rather, Woodruff testified that it was the "general feeling" in the medical field that such nerve injuries were preventable. (*Id.* at 15 (citing Woodruff Dep. 66, 73).) Finally, the Red Cross attacks Woodruff's reasoning and methodology, making much of the fact that Woodruff offered no opinion on how Ms. Montague's technique in the attempted venipuncture of Plaintiff was incorrect. (*Id.* at 17.) The Red Cross also contends that Woodruff's testimony is "conditioned" on the fact of a nerve injury, a premise that is itself flawed because Plaintiff's causation expert, Dr. Knobler, found no evidence of a nerve injury. (*Id.*; *see also* Knobler Dep. 136, 139-40.)

Despite the litany of complaints it has about Woodruff's testimony, the Court views all of them as issues that are properly dealt with by "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596. To be sure, the Red Cross points to a number aspects of Woodruff's testimony that are fairly viewed as weaknesses in the factual basis underlying his opinion. But mere weaknesses in the factual basis of an expert's opinion go to the *weight* of the testimony, not its admissibility. *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000).

A close examination of Woodruff's testimony and the surrounding record in this case illustrate the point that the Red Cross's challenge to Woodruff's testimony goes more to its weight and not its admissibility. As noted above, Woodruff opines that the venipuncture in this

case fell below the standard of care if it resulted in a nerve injury. The Red Cross questions this opinion because it is based on the premise that nerves are "deeper structures" that do not overlie veins. (Woodruff Dep. 66.) The Red Cross disputes Woodruff's knowledge of human anatomy in this respect, pointing out that *Gray's Anatomy* (which Woodruff cited as a source of his knowledge) notes that the medial cutaneous nerve "passes in front of, occasionally behind, the median cubital vein" of the forearm. *Gray's Anatomy, The Anatomical Basis of Clinical Practice* 856 (Susan Standring ed., 40th ed. 2008). But the Court does not read Woodruff's testimony to be making the sweeping statement that nerves *never* overlie veins. Indeed, Woodruff testified elsewhere that there are "sensory nerves" that come up to the surface of the arm. (Woodruff Dep. 121.) Woodruff's opinion that nerves are "deeper structures" that would not be injured in a properly performed venipuncture appears to be qualified by the context of Plaintiff's alleged nerve injury in this case — injury to the ulnar nerve or the antecubital brachial nerve, which were the nerves identified in doctors' reports that Woodruff reviewed. (*Id. See also id.* at 107 ("I was basing what I wrote [in my report] upon what [doctors] said in their medical records.").)

Nor does the Court find the "conditional" nature of Woodruff's opinion to be a basis for finding his testimony inadmissible. The Red Cross contends that Woodruff's testimony is "conditioned" on the fact of a nerve injury, a premise that is itself flawed because Plaintiff's causation expert, Dr. Knobler, did not confirm the presence of a nerve injury. But the fact that Plaintiff's other expert may have found no evidence of a nerve injury does not render Woodruff's testimony inadmissible. An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record. *McLean*, 224 F.3d at 801. Here,

13

Woodruff rested his assumption of a nerve injury upon doctors' reports that are in the record.

A more troublesome matter is the Red Cross's argument that Woodruff's reasoning is flawed because he offers no opinion on how Ms. Montague's technique fell below the standard of care. (Woodruff Dep. 103.) Woodruff has no knowledge of how Ms. Montague performed the venipuncture, leaving him without any basis to opine as to how her technique could have led to the nerve injury that allegedly resulted from the needle stick. While it seems counterintuitive that Woodruff could give a "standard of care" opinion without offering any insight into the technique employed by Ms. Montague in this case, the Court concludes that this potential weakness in Woodruff's testimony also impacts the weight of his opinion and not its admissibility. The Woodruff opinion upon which Plaintiff relies in this case is that Ms. Montague *necessarily* breached the standard of care if, in fact, she struck a nerve identified in the reports of Plaintiff's doctors. Woodruff's knowledge of how to perform a large needle venipuncture correctly enables him to opine regarding the appropriate standard of care. It is up to the trier of fact to decide what weight to give his testimony.

While the Court recognizes that Woodruff's testimony has some weaknesses that the Red Cross has exposed, those weaknesses are more appropriately addressed to the trier of fact. The weaknesses do not make Woodruff's testimony inadmissible under Fed. R. Evid. 702.

**B.      Plaintiff's Motion to Exclude Linda Chalmers' Testimony**

Not to be outdone by the Red Cross's motion to exclude her expert, Plaintiff goes on her own quest to exclude the testimony of Red Cross expert Linda Chalmers, BSRN, MA. After the substantive briefing on the Defendant's Motion for Summary Judgment was complete, Plaintiff filed a "Motion to Strike" Chalmers' Affidavit and her accompanying expert report. (ECF No.

168.)  The Court denies Plaintiff's motion for both procedural and substantive reasons.

### 1.    *Plaintiff's Motion is Untimely*

The Red Cross argues that the Court can deny Plaintiff's "Motion to Strike" without reaching the merits because it is untimely under this Court's Local Rules.  Under the circumstances presented here, the Court agrees.

The Red Cross originally attached Chalmers' expert report as part of Exhibit B to its motion for summary judgment.  But instead of including an authenticating affidavit of Chalmers with the report, the Red Cross mistakenly attached as Exhibit B another copy of an affidavit of Dr. Wissel, which is Exhibit A of the Red Cross's motion.  (*See* ECF 120-1 and 120-2.)  Seizing upon the error, Plaintiff argued in her Memorandum in Opposition to summary judgment that Chalmers' report was hearsay because it lacked an authenticating affidavit and therefore could not be considered by the Court in support of the Red Cross's motion for summary judgment. (Pl.'s Opp'n 10, ECF No. 148.)  Though Plaintiff took this position on the one hand, Plaintiff on the other hand used the Chalmers report as a "party admission" under Fed. R. Evid. 801 and supported her *own* opposition arguments with the Chalmers report.

The Red Cross moved for leave to file an amended Exhibit B to attach the correct affidavit, a motion that this Court granted.  (ECF Nos. 151 and 160.)  Accordingly, there is now before the Court a proper Chalmers Affidavit that authenticates the expert report originally attached to the motion for summary judgment.  It is this Affidavit that Plaintiff purportedly moves to strike.  (ECF No. 168.)

With regard to briefing on motions, S. D. Local Rule 7.2(a)(2) provides that no additional memoranda beyond the memorandum in support of a motion, the opposition memorandum, and

the reply are permitted without leave of court. The Red Cross argues that the "Motion to Strike" Chalmers' Affidavit is, in substance, an additional memorandum in opposition to the motion for summary judgment that is not permitted under S. D. Local Rule 7.2(a)(2). Plaintiff disputes that notion, pointing out that it could not move to strike Chalmers' Affidavit until this Court gave Defendant leave to file it. Under the state of affairs before the Court, the Red Cross has the better of the argument.

Though Plaintiff styles her motion as one to strike Chalmers' Affidavit, it is in substance a motion to strike *the expert report* that the Affidavit authenticates. Indeed, the Motion does not take issue with anything Chalmers states in the Affidavit itself; rather, Plaintiff's arguments focus upon the contents of Chalmers' expert report. But the expert report authenticated by the Chalmers Affidavit was already attached to the Red Cross's Motion for Summary Judgment, albeit attached to the wrong affidavit. Plaintiff raised the authentication issue (and resulting hearsay problem) as a ground for this Court to disregarding Chalmers' expert report. If Plaintiff had any *other* objections to the report as a matter of substance, she could have and should have raised them along with her authentication and hearsay objection.

Plaintiff's extra "motion to strike" is particularly inappropriate here, given that Plaintiff herself *relies* on the Chalmers expert report in her Memorandum in Opposition to summary judgment. If Plaintiff could rely on the report for her own purposes in opposing summary judgment, it is incongruous to allow Plaintiff to sandbag and save her substantive objections to other parts of the document for some later time after the summary-judgment briefing is concluded.

The Court realizes that the procedural posture of the various summary-judgment filings

here is unique, due in part to the Red Cross mistakenly filing an incorrect authenticating affidavit

with the Chalmers expert report. And if Plaintiff were truly seeking to strike the Chalmers

Affidavit based on the substance of the affidavit itself, this Court would view the timeliness

question differently. But here, Plaintiff's Motion is not attacking the affidavit: she is attacking

the expert report that the affidavit authenticates. Plaintiff could have and should have raised

these objections in her Memorandum in Opposition to summary judgment.

### 2. *Chalmers Expert Report is Admissible.*

Even assuming that Plaintiff's Motion to Strike is timely, the Court still finds the Motion

to be without substantive merit. Under the Fed. R. Evid. 702 standards previously set forth

above, Chalmers is properly qualified and her testimony sufficiently reliable for this Court to

consider on summary judgment.

Plaintiff first claims that Chalmers is not properly qualified to give expert testimony

because she is not an expert in venipuncture. Plaintiff argues that Chalmers' expert report fails

to show venipuncture experience and that Chalmers admits having no knowledge of any

"national regulations or standards" specifying actual venipuncture techniques. Plaintiff points to

the Infusion Nursing Society Standard of Care for Therapeutic Phlebotomy, Transfusion and

Venipuncture (cited by Plaintiff's expert, Mr. Woodruff) as a national standard, implying that

Chalmers' unfamiliarity with it cuts against her qualifications.

Plaintiff's argument need not detain this Court long, as her arguments, at best, impact the

weight of Chalmers' testimony and not its admissibility. Chalmers' curriculum vitae reveals

extensive experience in the blood banking industry and her report expressly states that her 26

years of experience includes "all procedures related to whole blood donor phlebotomy and post-

donation care in accordance with all State, Federal, and accrediting agencies."  And even though Chalmers says there is no "national standard of care" governing donor phlebotomy, she identified published industry standards that serve as a guide for training blood bank staff as to the basic principles of donor phlebotomy.  Plaintiff's issues with Chalmers' qualifications and knowledge can be addressed during cross examination; they do not render Chalmers unqualified.

As for Chalmers' opinions, Plaintiff argues they should be excluded because her report does not address "whether it is a violation of the standard of care to miss the vein entirely." (Mot. to Strike 7, ECF No. 168.)  Because the evidence is "uncontested" that the phlebotomist missed Plaintiff's vein entirely, Plaintiff says Chalmers' opinion is worthless because it "fails to address the issue in dispute."  (*Id.*)  The Court disagrees.

Chalmers' expert report is not based upon the premise that the phlebotomist actually accessed Plaintiff's vein.  Indeed, at page 4 of her report, Chalmers expressly recites the information suggesting that "the intended vein was no accessed and that some form of nerve irritation may have occurred."  (Chalmers Report Ex. 1, at 4, ECF No. 151-1.)  Notwithstanding that possibility, Chalmers opines that the Red Cross did not deviate from the standard of care. For example, because of "individual anatomical differences" in the layout of nerves and veins, Chalmers disagrees with Plaintiff's expert that nerve-related incidents are "completely preventable."  (*Id.*)  Thus, what Plaintiff characterizes as the phlebotomist having "missed the vein entirely," Chalmers may characterize as a nerve irritation occurring *before* the vein was reached, which is an inherent risk of even a properly performed venipuncture.  (*Id.*)  If believed, Chalmers' testimony would support a finding of no negligence. At best, the Plaintiff has noted a difference of opinion between Woodruff and Chalmers that would impact the weight of

Chalmers' opinion, not its admissibility.

Accordingly, Plaintiff has failed to identify a proper basis for excluding Chalmers' expert report and opinion. The Motion to Strike (ECF No. 168) is therefore denied.

**C.      Plaintiff's Objection to Dr. Mary Ellen Wissel's Expert Testimony**

The Red Cross's Motion for Summary Judgment included an expert affidavit from Mary Ellen Wissel, M.D. Dr. Wissel is the Medical Director of the Red Cross's Central Ohio Blood Services Region and is a member of the senior management team. (Wissel Aff. ¶ 1, ECF No. 120-1.) Dr. Wissel's affidavit includes, among other things, a description of the anatomy of veins within the arm, differences between donor phlebotomy and clinical phlebotomy (*i.e.*, drawing small vials of blood for medical testing), and Red Cross procedures at the donor site. (*Id.* at ¶¶ 4-17.) In her Opposition to the Red Cross's Motion for Summary Judgment, Plaintiff asks the Court to disregard Dr. Wissel's affidavit and preclude her from offering expert testimony because, Plaintiff argues, the Red Cross did not disclose Dr. Wissel as an expert or provide an expert report under Fed. R. Civ. P. 26(a)(2)(A). (Pl.'s Opp'n 9, ECF No. 148.)

Plaintiff is wrong as a matter of fact and under the rules of civil procedure. As factual matter, the Red Cross disclosed Dr. Wissel in the expert witness disclosure filed in this case. (Def's Expert Discl. ¶ 3, ECF No. 102.) And as a matter of procedural law, the Red Cross was not required to provide an expert report from Dr. Wissel. Expert reports are required as part of an expert witness disclosure only if the witness "is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B). Here, Dr. Wissel's affidavit indicates that she is not a retained expert and is not "specially employed" to provide expert testimony in this

case.  (Wissel Aff. ¶ 1.)  Rather, she is a Red Cross management employee whose duties with the Red Cross involve direct management responsibility over clinical services within the Red Cross's Central Ohio Blood Services Region.  (*Id.*)

Admittedly, Dr. Wissel's affidavit also describes one of her responsibilities as "being an expert in transfusion medicine and blood banking, which entails interacting with Red Cross staff, physicians / technologists in hospital blood banks, as well as medical staff in the community." (*Id.*)  For purposes of deciding the summary judgment motion before it, however, the Court does not read this affidavit testimony to mean that Dr. Wissel's duties with the Red Cross "regularly involve giving expert testimony," which would have triggered an obligation to provide an expert report under Fed. R. Civ. P. 26(a)(2)(B).  Dr. Wissel explains her responsibility as an "expert" in the context of describing her academic appointment at The Ohio State University Medical Center; it was not a statement that her job responsibilities at the Red Cross regularly involve giving expert testimony.  Thus, the Court finds that her affidavit is properly before the Court.[3]

### D.     The Red Cross's Motion for Summary Judgment

Having found the expert testimony and reports of the Plaintiff's and Defendant's experts admissible as summary judgment evidence, the Court turns to the merits of the Red Cross's Motion for Summary Judgment.  The Plaintiff's Complaint in this case alleges one cause of action — a state-law claim for negligence.  (Compl. ¶¶ 3-7.)  Under Ohio law, the familiar

---

[3]In finding Dr. Wissel's affidavit admissible for purposes of summary judgment, this Court is not suggesting that her testimony would automatically be admissible at trial.  If Plaintiff elicits testimony that Dr. Wissel's duties with the Red Cross do, in fact, "regularly involve giving expert testimony," Plaintiff may then seek exclusion of Dr. Wissel's testimony for the Red Cross's failure to abide by Fed. R. Civ. P. 26(a)(2)(B).  On the record before the Court *now*, however, the Red Cross has made a sufficient showing that no expert report was required.

elements of a negligence claim are the existence of a legal duty, a breach of that duty and injury resulting proximately the breach. *Mussivand v. David*, 45 Ohio St.3d 314, 318, 544 N.E. 2d 265 (1989); *see also Zaccone v. American Red Cross*, 872 F. Supp. 457, 460 (N.D. Ohio 1994) (applying Ohio law to a negligence action against the Red Cross).

The Red Cross argues that there is an absence of a genuine issue of material fact for trial because the Plaintiff's case is lacking on the breach and causation elements.

### 1. *The Applicable Standard of Care*

The Red Cross's first argument for summary judgment rests on the notion that in order to prove a breach of the applicable standard of care in a negligence action, one must first establish what the applicable standard of care *is*. And because Plaintiff's experts fail to establish the standard of care "applicable to blood bank phlebotomists such as those employed by the Red Cross," the Red Cross argues that Plaintiff cannot show negligence as a matter of law.

As an initial matter, the Court rejects the Red Cross's attempt to frame this issue (*i.e.*, the applicable standard of care) as one of "duty." The Red Cross cites the Ohio Supreme Court decision in *Estates of Morgan v. Fairfield Family Counseling Ctr.*, 77 Ohio St. 3d 284, 293, 673 N.E. 2d 1311 (1997), as authority for the proposition that the first element to be proven in any negligence case is "what duty is owed" and argues that Plaintiff's experts concede having no knowledge about the AABB protocols and the Red Cross operating procedures, which the Red Cross posits as setting forth the relevant standards of care. But *Estates of Morgan* does not inform the issue of a plaintiff establishing the applicable standard of care. At issue in *Estates of Morgan* was whether the defendants owed the plaintiffs a legal duty in the first instance; specifically at issue was whether the defendants (a counseling center and certain individual

employees) owed some legal duty to prevent a deadly assault perpetrated by a mentally ill family member of the victims. *Id.* at 293. Thus, *Estates of Morgan* tackled the legal issue of whether a duty existed and did not reach the question of what the applicable standard of care was.

In this case, the Red Cross's reliance on *Estates of Morgan* is misplaced, as there is no issue with regard to whether the Red Cross owed a legal duty to Plaintiff. Indeed, the Red Cross does not argue that it owed no legal duty to exercise ordinary care in performing the venipuncture and phlebotomy on Plaintiff. The Red Cross is simply arguing that Plaintiff fails to establish the relevant standard of care. But this is not an argument about "what duty is owed"; it is an argument about what standard of care applies to discharge a legal duty. To the extent the Red Cross intends to frame the "applicable standard of care" issue as being related to the "duty" element of Plaintiff's negligence claim, the Court rejects the argument as inappropriately conflating the issues of duty and breach of duty.

With the issue properly framed, the Red Cross's argument is not well taken. The applicable standard of care in a negligence action is generally a question of fact for the jury. *See Berdyck v. Shinde*, 66 Ohio St. 3d 573, 578-84, 613 N.E. 2d 1014 (1993) (discussing the "relevant standard of conduct" as being a question of fact). In this case, there is a genuine dispute as to what the applicable standard of care is. The Red Cross contends that the AABB standards and its own SOPs provide the applicable standard of care and that the unfamiliarity of Plaintiffs' experts with those standards precludes Plaintiff from establishing negligence. But the record also contains testimony that there are no national standards that govern the field of donor phlebotomy; indeed the Red Cross's own expert stated that there are "no national regulations or standards specifying the actual venipuncture technique(s) to be used" in explaining her reliance

on the AABB standards, among other resources.  (*See* Chalmers Aff. Ex. 1, at 2, ECF No. 151-1.)

Woodruff's unfamiliarity with AABB standards does not mean that he has failed to identify a relevant standard of care.  In the absence of a nationally recognized standard of care governing the field of donor phlebotomy, Woodruff's identification of a relevant standard of care is enough to create a jury question.  At a minimum, Woodruff has done this, positing that the applicable standard of care is the nursing standard of care as applied to venipuncture, which includes standard of the Infusion Nurses Society.  (Woodruff Dep. 10, 77.)

### 2.     *Deviation from the Standard of Care*

The Red Cross also argues that summary judgment is appropriate because Plaintiff has offered "no evidence" to establish that there was any deviation from the standard of care.  The Red Cross contends that Woodruff's expert testimony provides no evidentiary basis from which to conclude that Ms. Montague did anything wrong when she attempted the venipuncture that Plaintiff alleges to have caused the injury complained of in this case.  Plaintiff disputes not only the Red Cross's characterization of the evidence, but also argues that the doctrine of res ipsa loquitur obviates the need for her to present specific evidence of negligence to defeat summary judgment.

### a.     **Res Ipsa Loquitur**

Res ipsa loquitur is an evidentiary rule that permits (but does not require) an inference of negligence.  *Estate of Hall v. Akron Gen. Med. Ctr.*, 125 Ohio St. 3d 300, 2010-Ohio-1041, 927 N.E. 2d 1112, at ¶ 16.  As the Supreme Court of Ohio explained in *Estate of Hall*, the doctrine arose historically "by necessity when the true cause of an occurrence was known by or could be

23

determined by the defendant but not by the plaintiff." *Id.* (citing *Fink v. New York Cent. RR Co.*, 144 Ohio St. 1, 5, 56 N.E. 2d 456 (1944)). The origin of res ipsa loquitur (Latin for "the thing speaks for itself") comes from the English case of *Byrne v. Boadle*, 2 H. & C. 722, 159 Eng. Rep. 299 (1863), involving a barrel of flour that fell from a window onto a passer-by on the street below. Despite the plaintiff being unable to explain how the barrel had fallen, the *Byrne* court held that the mere fact of the barrel falling from above was sufficient evidence of negligence — and thus the res ipsa loquitur doctrine was born.

For the res ipsa loquitur doctrine to apply, a plaintiff must establish two elements: (1) that the instrumentality causing the injury was under the exclusive management and control of the defendant and (2) that the injury occurred under such circumstances that in the ordinary course of events would not have occurred if ordinary care had been observed. *Estate of Hall* at ¶ 27 (quoting *Hake v. George Wiedemann Brewing Co.*, 23 Ohio St. 2d 66-67, 262 N.E. 2d 703 (1970)). A court must determine on a case-by-case basis whether the doctrine applies. *Id.* at ¶ 26.

Plaintiff argues that she satisfies the elements of res ipsa loquitur in the case based on what she characterizes as the undisputed facts surrounding her injury. Specifically, Plaintiff notes that there was no blood flow when Ms. Montague stuck Plaintiff's arm with the needle, meaning that Ms. Montague "missed the vein of Ms. Ross and struck her nerve during the attempted venipuncture on September12, 2008." (Pl.'s Opp'n 6, ECF No. 148.) Plaintiff cites not only her own account of the incident as evidence to support this view, but also (1) the deposition testimony of Ms. Montague, who corroborated that no blood flowed through the needle during the attempted venipuncture, and (2) the report of Red Cross expert Chalmers, who

specifically noted that the information she considered on the incident "suggests the intended vein was not accessed." Thus, from the simple fact that her vein was not accessed during the attempted venipuncture, Plaintiff asserts that she is entitled to the inference of negligence that arises from the res ipsa loquitur doctrine.

Plaintiff's attempted reliance on res ipsa loquitur is misplaced. Under Ohio law, where "the evidence adduced [shows] that there are two equally efficient and probable causes of the injury, one of which is not attributable to the negligence of the defendant, the rule of res ipsa loquitur does not apply." *Jennings Buick, Inc. v. City of Cincinnati*, 63 Ohio St. 2d 167, 171, 406 N.E. 2d 1385, 1389 (1980) (cited with approval in *Estate of Hall*, *supra*, at ¶¶ 31-34). Such is the case here. Indeed, Plaintiff's own causation expert, Dr. Robert Knobler, indicated in his expert report and deposition that a needle stick can cause CRPS in the *absence* of negligence. (Knobler Dep. 119, ECF No. 121; *id.*, Ex. 7 at 7.) Similarly, Dr. Gerald Steiman, a Defendant's expert, stated in his report that CRPS is a complex medical condition of "unknown etiology." (Steiman Aff. Ex. E-1, ECF No. 120-6.) Moreover, defense expert Chalmers opined in her report that the Red Cross did not depart from the applicable standard of care and that the "possible complication of which Ms. Ross complains is an inherent risk of properly-performed venipuncture that she was made aware of prior to her decision to donate [blood]." (Chalmers Aff Ex. 1, ECF No. 151-1.) Based on the expert evidence before it, this Court finds this case to be a poor candidate for applying the rule of res ipsa loquitur. *Cf. Bentz v. American Red Cross*, No. 88-7608, 1990 U.S. Dist. LEXIS 8188, at *14 (E.D. Pa. July 3, 1990) (finding res ipsa loquitur inapplicable in blood donation case when plaintiff's expert admitted on cross-examination that the injury could have occurred in the absence of negligence).

This case is also ill-suited to the res ipsa loquitur rule because applying the doctrine depends upon two key assumptions, both of which are hotly disputed in this case. Plaintiff asks this Court to apply res ipsa loquitur due to her theories that (1) Ms. Montague "missed" her vein and struck a nerve during an attempted venipuncture and (2) the nerve strike caused Plaintiff to suffer CRPS. But the Red Cross disputes Plaintiff's key assumptions: the defense experts have disputed both the fact that there was a nerve strike *and* the accuracy of Plaintiff's CRPS/RSD diagnosis. This dispute only highlights the fact that this case involves opposing opinions on whether there was an injury proximately caused by the negligence of the defendant. This case is a far cry from a barrel of flour falling out of a window. Under these circumstances, the Court cannot conclude that res ipsa loquitur properly applies here.

### b.      Deviation from the Standard of Care

Having concluded that Plaintiff cannot rely on res ipsa loquitur rule to defeat summary judgment, the Court must determine if the Plaintiff has otherwise established a genuine issue of fact for trial on the issue of the Red Cross's deviation from the appropriate standard of care. The Red Cross argues that the Plaintiff has not done so because Woodruff's expert testimony falls short of showing a deviation from the standard of care.

The Red Cross highlights two particular aspects of Woodruff's testimony, both of which were discussed above. First, the Red Cross emphasizes Woodruff's inability at deposition to identify a specific act that Ms. Montague performed incorrectly in the attempted venipuncture that injured Plaintiff. (*See* Woodruff Dep. 103.) Second, the Red Cross argues that Woodruff's opinion is (1) conditioned on the fact of a nonexistent nerve injury and (2) based on the "false premise" that "nerves cannot be injured during a properly performed venipuncture" because

nerves do not overlie veins.  (Def's Mot. Summ. J. 21.)[4]

The Red Cross made both of these arguments (among others) in their bid to exclude Woodruff's testimony in this case.  The Court found that these issues with Woodruff's testimony were matters going to the weight, rather than the admissibility, of his opinion.  (*See* Part II.A.2, *ante*.)  Similarly here, in the context of deciding whether Plaintiff has established a genuine issue of fact for trial, the Court finds that Woodruff's testimony, though not particularly compelling, provides enough evidence to enable Plaintiff to overcome summary judgment.

As the Court noted previously, a glaring weakness in Woodruff's testimony regarding the alleged negligence of Ms. Montague is that he offers no opinion on how Ms. Montague's technique in attempting Plaintiff's venipuncture deviated from the appropriate standard of care.  (Woodruff Dep. 103.)  With no knowledge of how Ms. Montague performed the venipuncture, Woodruff offers no opinion as to how her technique could have led to the nerve injury that allegedly resulted from the needle stick.  But Woodruff's opinion is ultimately not one based on any specific mistake that Ms. Montague made.  Instead of relying on the details of what Ms. Montague did with regard to her venipuncture technique, Plaintiff's theory of liability is more overarching.  Plaintiff theorizes that Ms. Montague breached the standard of care *per se* by missing Plaintiff's vein entirely and striking a nerve, which in turn caused the CRPS/RSD condition from which Plaintiff allegedly suffers.

---

[4]The Red Cross also argues that the expert testimony of Dr. Knobler likewise fails to establish a deviation from the standard of care.  (Deft. Mot. Summ. J., at 23.)  The Court need not reach these arguments, however, as Dr. Knobler is not testifying in this case as a standard-of-care expert.  After the Red Cross filed its motion for summary judgment, the Court granted the Red Cross's motion to exclude Dr. Knobler's standard-of-care opinions.  (Order, ECF No. 135.)  Thus, Dr. Knobler's expert testimony in this case is limited to the issue of causation.  (*See id.*)

The Red Cross attacks an underlying premise of Woodruff's opinion — that there was a nerve strike in the first place — as a basis for granting summary judgment. The Red Cross places much stock in the fact that Plaintiff has "no documented injury" to the antebrachial cutaneous nerve, the specific nerve that Dr. Knobler, Plaintiff's other expert, believes was injured during the attempted venipuncture. (Def.'s Mot. Summ. J. 21 (citing Knobler Dep. 136).) And even if Ms. Montague struck Plaintiff's antebrachial cutaneous nerve during the procedure, the Red Cross argues that Woodruff's opinion remains flawed in light of Dr. Knobler's testimony that the antebrachial cutaneous nerve *can* overlie veins. (*Id.*) This testimony, the Red Cross argues, fatally contradicts Woodruff's premise that nerves "do not overlie veins," thereby rendering Woodruff's opinion unable to establish a deviation in the standard of care.

This Court is not persuaded by the Red Cross's argument in this regard. Viewing the evidence in a light favoring the nonmoving party, as the Court must when deciding a summary judgment motion, the record contains reports from treating physicians indicating *some* possibility of a nerve strike. Woodruff rested his assumption of a nerve injury upon treatment records of three of Plaintiff's treating physicians. (Woodruff Dep. 107.) Thus, there is at least some indication in the medical records that Plaintiff *may* have suffered a nerve injury or, at the very least, was subjected to a nerve strike.

Moreover, whether there was an actual nerve "injury" to Plaintiff may be beside the point. Indeed, Woodruff noted during his deposition testimony that he was using the terms "nerve injury" and "nerve strike" interchangeably, deferring to the doctors' medical diagnoses about which it was. (Woodruff Dep. 109-10.) Regardless of whether it was a nerve "injury" or

simply a nerve "strike" that resulted from the attempted venipuncture, Woodruff testified that Plaintiff's symptoms were consistent with something happening to the nerve, which, in turn, meant that there was a deviation in the standard of care because (in Woodruff's opinion) a properly performed venipuncture should not result in a nerve strike, at least not to one of the nerves identified in the doctors' reports. (*Id.* at 70-73, 108-21.)

Moreover, this Court is not persuaded by the Red Cross's attempt to juxtapose Woodruff's testimony with Dr. Knobler's. In particular, the Red Cross emphasizes that Dr. Knobler did not share Woodruff's view that nerves do not overlie veins, thereby undercutting (in the Red Cross's view) a major premise of Woodruff's opinion that Ms. Montague deviated from the appropriate standard of care in the attempted venipuncture at issue in this case. Even if the Court puts aside the questionable notion that the moving party can obtain summary judgment by having the Court credit the testimony of one of the non-moving party's experts over the testimony of the other one, the Court does not read Dr. Knobler's testimony to be as clear as the Red Cross portrays it. Contrary to the Red Cross's characterization of his testimony, Dr. Knobler was more equivocal in his discussion of whether veins overlie the antebrachial cutaneous nerve in some persons—

> Q. Does the lateral antebrachial cutaneous nerve anatomically lay below the cephalic vein?
>
> A. It could be anatomically in a number of positions in relationship to the cephalic vein. So that it could be lateral to it, adjacent to it, beneath it. Typically it is deeper, but in some individuals — *typically it's lateral to it so that you should not have the needle far enough laterally to cause this problem* [of striking the nerve].
>
> Q. Does it —
>
> A. And if the needle is far enough laterally, you can cause this problem.

Q.  Does it ever overlie the vein anatomically in some people?

A.  Not that I'm aware of.  I have not encountered any reports of that.

Q.  Are there anatomic variations among people in the placement of their nerves in the antecubital fossa?

A.  Certainly there are.

Q.  And you wouldn't deny that some patients may have nerves that overlie veins?

A.  Well, if that — I wouldn't deny that is a possibility.  However, I would indicate that *the normal position of this nerve is lateral to the vein* and that if the needle is placed laterally, that the likelihood is greater than not that there would be damage to the nerve.

(Knobler Dep. 136-38 (emphasis added).)

In full context, Dr. Knobler's testimony is not necessarily inconsistent with Woodruff's opinion that nerves are "deeper structures" that would not be injured in a properly performed venipuncture.  It is for the trier of fact, not this Court, to resolve the factual issues underlying Woodruff's opinion, including the issue of whether Dr. Knobler's opinion somehow discredits it.

This is not to say that a jury would be persuaded by the testimony of Dr. Knobler and/or Woodruff.  The jury could very well find the testimony of the Red Cross's experts to be more compelling.  But that is matter for trial, not summary judgment.  The Court finds that the Plaintiff has presented enough to create a genuine issue of material fact for trial on the issue of whether there was a deviation of the appropriate standard of care.

### 3.  *Causation*

The Red Cross also argues that summary judgment is appropriate because Plaintiff cannot create a genuine issue of material fact on the essential element of causation.  The Red Cross's argument here is similar to the one it makes in attacking Woodruff's ability to testify

about whether there was a breach in the standard of care. The Red Cross contends that Dr. Knobler bases his causation theory "entirely on the presumption that Ms. Montague injured Plaintiff's lateral antebrachial cutaneous nerve." (Def.'s Mot. Summ. J. 24 (citing Knobler Dep. 136).) But without any documented diagnosis of a nerve injury to Plaintiff, the Red Cross argues that Dr. Knobler provides nothing more than a "hypothesis" that cannot go to the jury. (*Id.* at 26.) Bolstering this argument, the Red Cross points out that Plaintiff was diagnosed with CRPS Type 1, which manifests in the *absence* of a known nerve injury. Yet, Dr. Knobler joins in the diagnosis of CRPS Type 1 — a fact that the Red Cross argues is effectively a concession by Dr. Knobler that there was no nerve injury to Plaintiff. (*Id.* at 25.)

Though the Red Cross's argument might ultimately be compelling to a jury, it is just that — an argument for the jury. To the extent the Red Cross argues that the inconsistencies and questionable factual assumptions underlying Dr. Knobler's testimony render his causation opinion inadmissible under Fed. R. Civ. P. 702, the Court is not persuaded. The matters cited by the Red Cross as weaknesses in Dr. Knobler's so-called causation "hypothesis" impact the weight of Dr. Knobler's expert testimony, not its admissibility. The Court finds that it can properly consider Dr. Knobler's testimony in deciding the Motion for Summary Judgment before it.

As to whether Dr. Knobler's testimony creates a triable issue of fact on the issue of causation, this Court finds that it does. Simply stated, Dr. Knobler's opinion is that Plaintiff suffered a "needlestick" to her antebrachial cutaneous nerve and that the "needlestick" directly caused the onset of CRPS/RSD. (Knobler Dep. 135-37, 210-13.) As the Court discussed earlier in discussing Woodruff's opinion, the record is not as bare of evidence to support the

presumption of a nerve strike as the Red Cross argues. Like Woodruff, Dr. Knobler also relies

on treatment records indicating that there may have been a nerve strike during the attempted

venipuncture, which Dr. Knobler in turn links as the cause of the onset of CRPS/RSD. (*Id.* at

135.)[5]  These records, coupled with Dr. Knobler's testimony that Plaintiff's symptoms were

consistent with a strike to the antebrachial cutaneous nerve, provide some basis for Dr. Knobler's

causation opinion.

The fact that there has been no documented diagnosis by Plaintiff's treating physicians of

a nerve injury to Plaintiff does not render Dr. Knobler's causation opinion inadmissible or

incapable of creating a genuine issue of fact. Dr. Knobler's expert credentials,[6] which are not

contested by the Red Cross, make him qualified to opine as to a patient's symptoms being

consistent with a nerve strike or a nerve injury. The fact that his belief that Plaintiff suffered a

nerve injury might conflict with the diagnoses of Plaintiff's treating physicians does not mean

that Dr. Knobler's opinion should be cast aside. The dispute among the doctors and experts

*creates* an issue of fact for trial.

The Red Cross also attempts to make hay out of the fact that Dr. Knobler diagnosed

---

[5]Though this Court has precluded Dr. Knobler from testifying as to the Red Cross's
alleged breach of the standard of care, the Court has not precluded him from testifying as
Plaintiff's causation expert. The Court views his testimony about the possible nerve strike as
fairly connected with his causation opinion. (*See* Knobler Dep. 135-37.)

[6]Among other qualifications, Dr. Knobler is board certified in neurology by the American
Board of Psychiatry and Neurology. (Knobler Dep. Ex. 2.) Dr. Knobler has been a professor in
the Department of Neurology at the Jefferson Medical College of Thomas Jefferson University
(Philadelphia, PA) since 1991 and a clinical professor in the Department of Neurology at the
Drexel University College of Medicine since 2003. (*Id.*) He is also the Director of the Knobler
Institute for Neurologic Disease ("KIND"), which he founded in 1998. Before KIND's
founding, Dr. Knobler was the Director of the RSD Clinic at Thomas Jefferson University
Hospital. (*Id.*)

Plaintiff with CRPS type 1, which is the type of CRPS that manifests without a known nerve injury. But this aspect of Dr. Knobler's opinion does not create a basis for summary judgment. Dr. Knobler testified that"[i]f she had a *documented injury* to the lateral [antebrachial cutaneous nerve], I would be able to say that she had complex regional pain syndrome type 2, causalgia." (Knobler Dep. 140 (emphasis added).) Saying that Plaintiff did not have a "documented" nerve injury (*i.e.*, one diagnosed by her treating physicians) is different from saying that Plaintiff did not suffer one at all. While Dr. Knobler may *believe* that Plaintiff suffered a nerve injury as a result of the aborted venipuncture (*id.* at 136), the validity of his diagnosis of CRPS type 1 notwithstanding that belief is a matter that should be resolved by a jury and not by this Court on summary judgment.

### 4. *"Negligent Aftercare"*

As an additional basis for denying summary judgment, Plaintiff argues that her claim of negligence based upon "negligent aftercare" survives in any event because the Red Cross's motion for summary judgment did not address that theory of liability. Plaintiff cites to the Red Cross's own document (entitled "Red Cross Job Aid for Nerve Irritation or Complication Code 'XN'") specifying certain guidelines for action when a donor reports the symptoms reported by Plaintiff and contends that the Red Cross's employees did not provide the follow-up care contained there. (*See* Pl's Opp'n Exs. G and I.)[7] Even though the Court finds that there remains

---

[7]The Red Cross objects to Plaintiff's Exhibit G, the "Red Cross Job Aid for Nerve Irritation or Complication Code 'XN'" document, on the basis that Plaintiff "improperly attempts to use this document in lieu of expert testimony and in contradiction of the only testimony regarding this document in the record." The objection is overruled. The Red Cross's conclusory bases for its objection fail to explain why Plaintiff cannot rely on the Red Cross's own document to establish a baseline standard of care.

a genuine issue of material fact for trial on the issues raised in the Red Cross's Motion, it is appropriate to address the issue of whether Plaintiff may pursue a "negligent aftercare" theory at trial.

The Red Cross argues that Plaintiff has no aftercare claim "separate from her negligence claim." But Plaintiff has no obligation to set forth her distinct theories of negligence in separate counts. In this case, Plaintiff's Complaint alleged a single claim of negligence and included the following allegation:

> Defendants had the opportunity to assist in providing necessary, but expensive [*sic*] care for Plaintiff early on after her injury and failed to do so, thereby exacerbating Plaintiff's physical injury and damages, making her condition worse and directly causing additional injury and permanency.

(Compl. ¶ 7.) The Court finds that this allegation provided ample notice that Plaintiff's negligence claim included a theory that the Red Cross failed to provide appropriate aftercare. The Court finds that a "negligent aftercare" claim is properly pleaded and in play in this case.

The Red Cross also contends that no negligent aftercare claim should be recognized in any event because Plaintiff fails to support it with expert testimony. The Court need not address this argument for summary judgment because the Red Cross did not raise it until its reply brief. *See Guzman v. Denny's Inc.*, 40 F. Supp. 2d 930, 937 (S.D. Ohio 1999). Nevertheless, the Court will do so in order to provide guidance to the parties with respect to the proof that will be required at trial with regard to the "negligent aftercare" theory.

In response to the Red Cross's argument that she lacks expert support for her negligent aftercare claim, Plaintiff says she can establish liability without it. Plaintiff cites *McDonnell v. American Nat'l Red Cross*, Nos. 243320 and 245043, 2004 Mich. App. LEXIS 1840 (Mich. Ct. App. June 29, 2006), for the proposition that a plaintiff can show liability for "blood donor

34

aftercare injuries" without expert testimony.  The Court finds *McDonnell* (which is not binding authority in any event) unpersuasive to the circumstances at issue in this case.

As an initial matter, *McDowell* is not binding on this Court because it was decided under Michigan law.  Its validity in Michigan is also unclear, as the Michigan Supreme Court appears to have vacated the portion of *McDowell* upon which Plaintiff relies.  *See McDowell v. American Nat'l Red Cross*, 472 Mich. 871, 693 N.W. 2d 814 (2005) (table decision) (remanding to the court of appeals "for reconsideration of the issue whether plaintiff stated a cause of action in ordinary negligence in light of *Bryant v. Oakpointe Villa Nursing Center,* 471 Mich. 411; 684 N.W.2d 864 (2004)).

Regardless of *McDowell's* continued vitality in its jurisdiction, the Court finds the case readily distinguishable.  *McDowell* involved injuries suffered by a blood donor who fainted while walking unassisted from the donor chair to a snack table.  Plaintiff alleged that the Red Cross knew or should have known that donors could be "wobbly" after donating blood and Red Cross employees therefore should have provided assistance for donors walking from donor chair after completing the blood donations.  The Michigan Court of Appeals found that this type of negligence allegation was separate and distinct from a medical malpractice type of claim and therefore could be established without expert testimony.  *Id.*, 2004 Mich. App. LEXIS at *10.

Unlike *McDonnell*, Plaintiff's negligent aftercare claim does not allege a claim of ordinary negligence that would be within the knowledge of a lay juror.  Rather, Plaintiff claims that negligent aftercare either caused or exacerbated her condition.  If Plaintiff is seeking to link the Red Cross's allegedly negligent aftercare to the onset or worsening of her CRPS/RSD condition, such a theory requires expert testimony to assist the jury, at least with regard to the

issue of causation. While it is within the ken of a lay juror to determine whether there was negligence with regard to something like providing a potentially wobbly blood donor with an escort to walk a short distance after giving blood (*i.e.*, the facts at issue in *McDowell*), it takes specialized knowledge to make a valid factual determination of whether certain factors contributed to the onset or exacerbation of a complex medical condition like CRPS/RSD.

Though the Red Cross is right about the sort of evidence that Plaintiff needs to show negligent aftercare, the Red Cross is wrong about what evidence Plaintiff already has to support her negligent aftercare claim at the summary-judgment stage. The Court rejects the Red Cross's argument that Plaintiff has not supported the aftercare theory with expert testimony. The Red Cross emphasizes Dr. Knobler's testimony that Plaintiff suffered from CRPS/RSD immediately upon the needle stick and that "delay in care" did not contribute to the condition developing in Plaintiff. (Knobler Dep. 299.) But Dr. Knobler also testified that "the time to make an impact on the disease is in the first 48 hours to one week," suggesting that appropriate aftercare could have alleviated Plaintiff's symptoms. (*Id.* at 301.) Thus, on the record before the Court, Plaintiff has supported her negligent aftercare theory with expert testimony. Thus, summary judgment on Plaintiff's negligent aftercare theory would have been inappropriate had the Red Cross moved for it.

### E. Evidentiary Objections

In its Reply Brief, the Red Cross objected to numerous items of evidence relied upon by Plaintiff in her opposition to summary judgment. (Def.'s Reply 2, ECF No. 159.) With the exception of the objection to Plaintiff's Exhibit G (which this Court overruled above), the Court finds these objections to be moot. Except for Plaintiff's Exhibit G, the Court did not rely on any

of the evidentiary materials objected to by the Red Cross in reaching its decision here. The Court therefore overrules all of the remaining objections as moot.

Similarly, the Court denies as moot Plaintiff's motion to substitute certified copies of Plaintiff's Exhibits K and L for the copies attached to her Memorandum in Opposition.

### III. Conclusion

As set forth above—

1.     Defendant American Red Cross's Motion to Exclude and Preclude the Use of the Testimony of Mr. David Woodruff and for Summary Judgment (ECF No. 120) is **DENIED.**

2.     The Motion of Plaintiff Lauren J. Ross to Strike Affidavit of Red Cross Standard of Care Expert Linda Chalmers (ECF No. 168) is **DENIED.**

3.     Plaintiff's motion to substitute certified copies of letters issued to the American Red Cross from the United States Department Health and Human Services, Food and Drug Administration, for uncertified copies attached to Plaintiff's Memorandum in Opposition to summary judgment (ECF No. 166) is **DENIED AS MOOT.**

**IT IS SO ORDERED.**

**/s/ Gregory L. Frost**
**GREGORY L. FROST**
**UNITED STATES DISTRICT JUDGE**